(Slip Opinion) OCTOBER TERM, 2011 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MILLER *v.* ALABAMA

### CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF ALABAMA

No. 10–9646.   Argued March 20, 2012—Decided June 25, 2012*

In each of these cases, a 14-year-old was convicted of murder and sentenced to a mandatory term of life imprisonment without the possibility of parole.  In No. 10–9647, petitioner Jackson accompanied two other boys to a video store to commit a robbery; on the way to the store, he learned that one of the boys was carrying a shotgun.  Jackson stayed outside the store for most of the robbery, but after he entered, one of his co-conspirators shot and killed the store clerk.  Arkansas charged Jackson as an adult with capital felony murder and aggravated robbery, and a jury convicted him of both crimes.  The trial court imposed a statutorily mandated sentence of life imprisonment without the possibility of parole.  Jackson filed a state habeas petition, arguing that a mandatory life-without-parole term for a 14-year-old violates the Eighth Amendment.  Disagreeing, the court granted the State's motion to dismiss.  The Arkansas Supreme Court affirmed.

In No. 10–9646, petitioner Miller, along with a friend, beat Miller's neighbor and set fire to his trailer after an evening of drinking and drug use.  The neighbor died.  Miller was initially charged as a juvenile, but his case was removed to adult court, where he was charged with murder in the course of arson.  A jury found Miller guilty, and the trial court imposed a statutorily mandated punishment of life without parole.  The Alabama Court of Criminal Appeals affirmed, holding that Miller's sentence was not overly harsh when compared to his crime, and that its mandatory nature was permissible under

——————

*Together with No. 10–9647, *Jackson* v. *Hobbs, Director, Arkansas Department of Correction,* on certiorari to the Supreme Court of Arkansas.

the Eighth Amendment.

*Held:* The Eighth Amendment forbids a sentencing scheme that man-
dates life in prison without possibility of parole for juvenile homicide
offenders.  Pp. 6–27.

   (a) The Eighth Amendment's prohibition of cruel and unusual pun-
ishment "guarantees individuals the right not to be subjected to ex-
cessive sanctions."  *Roper* v. *Simmons*, 543 U. S. 551, 560.  That right
"flows from the basic 'precept of justice that punishment for crime
should be graduated and proportioned'" to both the offender and the
offense.  *Ibid.*

   Two strands of precedent reflecting the concern with proportionate
punishment come together here.  The first has adopted categorical
bans on sentencing practices based on mismatches between the cul-
pability of a class of offenders and the severity of a penalty.  See*, e.g.,*
*Kennedy* v. *Louisiana,* 554 U. S. 407.  Several cases in this group
have specially focused on juvenile offenders, because of their lesser
culpability.  Thus, *Roper* v. *Simmons* held that the Eighth Amend-
ment bars capital punishment for children, and *Graham* v. *Florida*,
560 U. S. ___, concluded that the Amendment prohibits a sentence of
life without the possibility of parole for a juvenile convicted of a non-
homicide offense.  *Graham* further likened life without parole for ju-
veniles to the death penalty, thereby evoking a second line of cases.
In those decisions, this Court has required sentencing authorities to
consider the characteristics of a defendant and the details of his of-
fense before sentencing him to death.  See*, e.g., Woodson* v. *North
Carolina,* 428 U. S. 280 (plurality opinion).  Here, the confluence of
these two lines of precedent leads to the conclusion that mandatory
life without parole for juveniles violates the Eighth Amendment.

   As to the first set of cases: *Roper* and *Graham* establish that chil-
dren are constitutionally different from adults for sentencing purpos-
es.  Their "'lack of maturity'" and "'underdeveloped sense of respon-
sibility'" lead to recklessness, impulsivity, and heedless risk-taking.
*Roper,* 543 U. S., at 569.  They "are more vulnerable . . . to negative
influences and outside pressures," including from their family and
peers; they have limited "contro[l] over their own environment" and
lack the ability to extricate themselves from horrific, crime-producing
settings.  *Ibid.*  And because a child's character is not as "well
formed" as an adult's, his traits are "less fixed" and his actions are
less likely to be "evidence of irretrievabl[e] deprav[ity]."  *Id.,* at 570.
*Roper* and *Graham* emphasized that the distinctive attributes of
youth diminish the penological justifications for imposing the harsh-
est sentences on juvenile offenders, even when they commit terrible
crimes.

   While *Graham*'s flat ban on life without parole was for nonhomi-

Syllabus

cide crimes, nothing that *Graham* said about children is crime-specific. Thus, its reasoning implicates any life-without-parole sentence for a juvenile, even as its categorical bar relates only to non-homicide offenses. Most fundamentally, *Graham* insists that youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole. The mandatory penalty schemes at issue here, however, prevent the sentencer from considering youth and from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. This contravenes *Graham'*s (and also *Roper'*s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children.

*Graham* also likened life-without-parole sentences for juveniles to the death penalty. That decision recognized that life-without-parole sentences "share some characteristics with death sentences that are shared by no other sentences." 560 U. S., at \_\_\_. And it treated life without parole for juveniles like this Court's cases treat the death penalty, imposing a categorical bar on its imposition for nonhomicide offenses. By likening life-without-parole sentences for juveniles to the death penalty, *Graham* makes relevant this Court's cases demanding individualized sentencing in capital cases. In particular, those cases have emphasized that sentencers must be able to consider the mitigating qualities of youth. In light of *Graham*'s reasoning, these decisions also show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders. Pp. 6−17.

  (b) The counterarguments of Alabama and Arkansas are unpersuasive. Pp. 18–27.

      (1) The States first contend that *Harmelin* v. *Michigan,* 501 U. S. 957, forecloses a holding that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment. *Harmelin* declined to extend the individualized sentencing requirement to noncapital cases "because of the qualitative difference between death and all other penalties." *Id.,* at 1006 (KENNEDY, J., concurring in part and concurring in judgment). But *Harmelin* had nothing to do with children, and did not purport to apply to juvenile offenders. Indeed, since *Harmelin*, this Court has held on multiple occasions that sentencing practices that are permissible for adults may not be so for children. See *Roper*, 543 U. S. 551; *Graham*, 560 U. S \_\_\_.

  The States next contend that mandatory life-without-parole terms for juveniles cannot be unconstitutional because 29 jurisdictions impose them on at least some children convicted of murder. In considering categorical bars to the death penalty and life without parole, this Court asks as part of the analysis whether legislative enactments and actual sentencing practices show a national consensus

against a sentence for a particular class of offenders. But where, as here, this Court does not categorically bar a penalty, but instead requires only that a sentencer follow a certain process, this Court has not scrutinized or relied on legislative enactments in the same way. See, *e.g., Sumner* v. *Schuman,* 483 U. S. 66.

In any event, the "objective indicia of society's standards," *Graham,* 560 U. S., at ___, that the States offer do not distinguish these cases from others holding that a sentencing practice violates the Eighth Amendment. Fewer States impose mandatory life-without-parole sentences on juvenile homicide offenders than authorized the penalty (life-without-parole for nonhomicide offenders) that this Court invalidated in *Graham*. And as *Graham* and *Thompson* v. *Oklahoma,* 487 U. S. 815, explain, simply counting legislative enactments can present a distorted view. In those cases, as here, the relevant penalty applied to juveniles based on two separate provisions: One allowed the transfer of certain juvenile offenders to adult court, while another set out penalties for any and all individuals tried there. In those circumstances, this Court reasoned, it was impossible to say whether a legislature had endorsed a given penalty for children (or would do so if presented with the choice). The same is true here. Pp. 18–25.

(2) The States next argue that courts and prosecutors sufficiently consider a juvenile defendant's age, as well as his background and the circumstances of his crime, when deciding whether to try him as an adult. But this argument ignores that many States use mandatory transfer systems. In addition, some lodge the decision in the hands of the prosecutors, rather than courts. And even where judges have transfer-stage discretion, it has limited utility, because the decisionmaker typically will have only partial information about the child or the circumstances of his offense. Finally, because of the limited sentencing options in some juvenile courts, the transfer decision may present a choice between a light sentence as a juvenile and standard sentencing as an adult. It cannot substitute for discretion at post-trial sentencing. Pp. 25−27.

No. 10−9646, 63 So. 3d 676, and No. 10−9647, 2011 Ark. 49, ___ S. W. 3d ___, reversed and remanded.

KAGAN, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. BREYER, J., filed a concurring opinion, in which SOTOMAYOR, J., joined. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined. ALITO, J., filed a dissenting opinion, in which SCALIA, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

―――――――

Nos. 10–9646 and 10–9647

―――――――

## EVAN MILLER, PETITIONER

10–9646　　　　　　*v.*

## ALABAMA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF ALABAMA

## KUNTRELL JACKSON, PETITIONER

10–9647　　　　　　*v.*

## RAY HOBBS, DIRECTOR, ARKANSAS
DEPARTMENT OF CORRECTION

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF ARKANSAS

[June 25, 2012]

JUSTICE KAGAN delivered the opinion of the Court.

The two 14-year-old offenders in these cases were convicted of murder and sentenced to life imprisonment without the possibility of parole. In neither case did the sentencing authority have any discretion to impose a different punishment. State law mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life *with* the possibility of parole) more appropriate. Such a scheme prevents those meting out punishment from considering a juvenile's "lessened culpability" and greater "capacity for change," *Graham* v. *Florida*, 560 U. S. ___,

___ (2010) (slip op., at 17, 23), and runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties. We therefore hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on "cruel and unusual punishments."

## I

## A

In November 1999, petitioner Kuntrell Jackson, then 14 years old, and two other boys decided to rob a video store. En route to the store, Jackson learned that one of the boys, Derrick Shields, was carrying a sawed-off shotgun in his coat sleeve. Jackson decided to stay outside when the two other boys entered the store. Inside, Shields pointed the gun at the store clerk, Laurie Troup, and demanded that she "give up the money." *Jackson* v. *State*, 359 Ark. 87, 89, 194 S. W. 3d 757, 759 (2004) (internal quotation marks omitted). Troup refused. A few moments later, Jackson went into the store to find Shields continuing to demand money. At trial, the parties disputed whether Jackson warned Troup that "[w]e ain't playin'," or instead told his friends, "I thought you all was playin'." *Id.,* at 91, 194 S. W. 3d, at 760 (internal quotation marks omitted). When Troup threatened to call the police, Shields shot and killed her. The three boys fled empty-handed. See *id.,* at 89–92, 194 S. W. 3d, at 758–760.

Arkansas law gives prosecutors discretion to charge 14-year-olds as adults when they are alleged to have committed certain serious offenses. See Ark. Code Ann. §9–27–318(c)(2) (1998). The prosecutor here exercised that authority by charging Jackson with capital felony murder and aggravated robbery. Jackson moved to transfer the case to juvenile court, but after considering the alleged facts of the crime, a psychiatrist's examination, and Jackson's juvenile arrest history (shoplifting and several inci-

dents of car theft), the trial court denied the motion, and an appellate court affirmed. See *Jackson* v. *State*, No. 02–535, 2003 WL 193412, *1 (Ark. App., Jan. 29, 2003); §§9–27–318(d), (e). A jury later convicted Jackson of both crimes. Noting that "in view of [the] verdict, there's only one possible punishment," the judge sentenced Jackson to life without parole. App. in No. 10–9647, p. 55 (hereinafter Jackson App.); see Ark. Code Ann. §5–4–104(b) (1997) ("A defendant convicted of capital murder or treason shall be sentenced to death or life imprisonment without parole").[1] Jackson did not challenge the sentence on appeal, and the Arkansas Supreme Court affirmed the convictions. See 359 Ark. 87, 194 S. W. 3d 757.

Following *Roper* v. *Simmons*, 543 U. S. 551 (2005), in which this Court invalidated the death penalty for all juvenile offenders under the age of 18, Jackson filed a state petition for habeas corpus. He argued, based on *Roper*'s reasoning, that a mandatory sentence of life without parole for a 14-year-old also violates the Eighth Amendment. The circuit court rejected that argument and granted the State's motion to dismiss. See Jackson App. 72–76. While that ruling was on appeal, this Court held in *Graham* v. *Florida* that life without parole violates the Eighth Amendment when imposed on juvenile nonhomicide offenders. After the parties filed briefs addressing that decision, the Arkansas Supreme Court affirmed the dismissal of Jackson's petition. See *Jackson* v. *Norris*, 2011 Ark. 49, ___ S. W. 3d ___. The majority found that *Roper* and *Graham* were "narrowly tailored" to their contexts: "death-penalty cases involving a juvenile and life-imprisonment-without-parole cases for nonhomicide of-

––––––––––

[1] Jackson was ineligible for the death penalty under *Thompson* v. *Oklahoma*, 487 U. S. 815 (1988) (plurality opinion), which held that capital punishment of offenders under the age of 16 violates the Eighth Amendment.

fenses involving a juvenile." *Id.*, at 5, ___ S. W. 3d, at ___. Two justices dissented. They noted that Jackson was not the shooter and that "any evidence of intent to kill was severely lacking." *Id.,* at 10, ___ S. W. 3d, at ___ (Danielson, J., dissenting). And they argued that Jackson's mandatory sentence ran afoul of *Graham*'s admonition that "'[a]n offender's age is relevant to the Eighth Amendment, and criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed.'" *Id.*, at 10–11, ___ S. W. 3d, at ___ (quoting *Graham*, 560 U. S., at ___ (slip op., at 25)).[2]

B

Like Jackson, petitioner Evan Miller was 14 years old at the time of his crime. Miller had by then been in and out of foster care because his mother suffered from alcoholism and drug addiction and his stepfather abused him. Miller, too, regularly used drugs and alcohol; and he had attempted suicide four times, the first when he was six years old. See *E. J. M.* v. *State*, 928 So. 2d 1077, 1081 (Ala. Crim. App. 2004) (Cobb, J., concurring in result); App. in No. 10–9646, pp. 26–28 (hereinafter Miller App.).

One night in 2003, Miller was at home with a friend, Colby Smith, when a neighbor, Cole Cannon, came to make a drug deal with Miller's mother. See 6 Record in No. 10–9646, p. 1004. The two boys followed Cannon back to his trailer, where all three smoked marijuana and

---

[2] For the first time in this Court, Arkansas contends that Jackson's sentence was not mandatory. On its view, state law then in effect allowed the trial judge to suspend the life-without-parole sentence and commit Jackson to the Department of Human Services for a "training-school program," at the end of which he could be placed on probation. Brief for Respondent in No. 10–9647, pp. 36–37 (hereinafter Arkansas Brief) (citing Ark. Code Ann. §12–28–403(b)(2) (1999)). But Arkansas never raised that objection in the state courts, and they treated Jackson's sentence as mandatory. We abide by that interpretation of state law. See, *e.g., Mullaney* v. *Wilbur*, 421 U. S. 684, 690–691 (1975).

played drinking games. When Cannon passed out, Miller stole his wallet, splitting about $300 with Smith. Miller then tried to put the wallet back in Cannon's pocket, but Cannon awoke and grabbed Miller by the throat. Smith hit Cannon with a nearby baseball bat, and once released, Miller grabbed the bat and repeatedly struck Cannon with it. Miller placed a sheet over Cannon's head, told him "'I am God, I've come to take your life,'" and delivered one more blow. *Miller* v. *State*, 63 So. 3d 676, 689 (Ala. Crim. App. 2010). The boys then retreated to Miller's trailer, but soon decided to return to Cannon's to cover up evidence of their crime. Once there, they lit two fires. Cannon eventually died from his injuries and smoke inhalation. See *id.*, at 683–685, 689.

Alabama law required that Miller initially be charged as a juvenile, but allowed the District Attorney to seek removal of the case to adult court. See Ala. Code §12–15–34 (1977). The D. A. did so, and the juvenile court agreed to the transfer after a hearing. Citing the nature of the crime, Miller's "mental maturity," and his prior juvenile offenses (truancy and "criminal mischief"), the Alabama Court of Criminal Appeals affirmed. *E. J. M.* v. *State*, No. CR–03–0915, pp. 5–7 (Aug. 27, 2004) (unpublished memorandum).[3] The State accordingly charged Miller as an adult with murder in the course of arson. That crime (like capital murder in Arkansas) carries a mandatory mini-

————————

[3] The Court of Criminal Appeals also affirmed the juvenile court's denial of Miller's request for funds to hire his own mental expert for the transfer hearing. The court pointed out that under governing Alabama Supreme Court precedent, "the procedural requirements of a trial do not ordinarily apply" to those hearings. *E. J. M.* v. *State*, 928 So. 2d 1077 (2004) (Cobb, J., concurring in result) (internal quotation marks omitted). In a separate opinion, Judge Cobb agreed on the reigning precedent, but urged the State Supreme Court to revisit the question in light of transfer hearings' importance. See *id.,* at 1081 ("[A]lthough later mental evaluation as an adult affords some semblance of procedural due process, it is, in effect, too little, too late").

mum punishment of life without parole. See Ala. Code §§13A–5–40(9), 13A–6–2(c) (1982).

Relying in significant part on testimony from Smith, who had pleaded to a lesser offense, a jury found Miller guilty. He was therefore sentenced to life without the possibility of parole. The Alabama Court of Criminal Appeals affirmed, ruling that life without parole was "not overly harsh when compared to the crime" and that the mandatory nature of the sentencing scheme was permissible under the Eighth Amendment. 63 So. 3d, at 690; see *id.,* at 686–691. The Alabama Supreme Court denied review.

We granted certiorari in both cases, see 565 U. S. ___ (2011) (No. 10–9646); 565 U. S. ___ (2011) (No. 10–9647), and now reverse.

## II

The Eighth Amendment's prohibition of cruel and unusual punishment "guarantees individuals the right not to be subjected to excessive sanctions." *Roper*, 543 U. S., at 560. That right, we have explained, "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned'" to both the offender and the offense. *Ibid.* (quoting *Weems* v. *United States*, 217 U. S. 349, 367 (1910)). As we noted the last time we considered life-without-parole sentences imposed on juveniles, "[t]he concept of proportionality is central to the Eighth Amendment." *Graham*, 560 U. S., at ___ (slip op., at 8). And we view that concept less through a historical prism than according to "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle* v. *Gamble*, 429 U. S. 97, 102 (1976) (quoting *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion)).

The cases before us implicate two strands of precedent reflecting our concern with proportionate punishment. The first has adopted categorical bans on sentencing

practices based on mismatches between the culpability of a class of offenders and the severity of a penalty. See *Graham*, 560 U. S., at \_\_\_ (slip op., at 9–10) (listing cases). So, for example, we have held that imposing the death penalty for nonhomicide crimes against individuals, or imposing it on mentally retarded defendants, violates the Eighth Amendment. See *Kennedy* v. *Louisiana*, 554 U. S. 407 (2008); *Atkins* v. *Virginia*, 536 U. S. 304 (2002). Several of the cases in this group have specially focused on juvenile offenders, because of their lesser culpability. Thus, *Roper* held that the Eighth Amendment bars capital punishment for children, and *Graham* concluded that the Amendment also prohibits a sentence of life without the possibility of parole for a child who committed a nonhomicide offense. *Graham* further likened life without parole for juveniles to the death penalty itself, thereby evoking a second line of our precedents. In those cases, we have prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death. See *Woodson* v. *North Carolina*, 428 U. S. 280 (1976) (plurality opinion); *Lockett* v. *Ohio*, 438 U. S. 586 (1978). Here, the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment.[4]

---

[4] The three dissenting opinions here each take issue with some or all of those precedents. See *post,* at 5–6 (opinion of ROBERTS, C. J.); *post,* at 1–6 (opinion of THOMAS, J.); *post,* at 1–4 (opinion of ALITO, J.). That is not surprising: their authors (and joiner) each dissented from some or all of those precedents. See, *e.g., Kennedy*, 554 U. S., at 447 (ALITO, J., joined by ROBERTS, C. J., and SCALIA and THOMAS, JJ., dissenting); *Roper*, 543 U. S., at 607 (SCALIA, J., joined by THOMAS, J., dissenting); *Atkins*, 536 U. S., at 337 (SCALIA, J., joined by THOMAS, J., dissenting); *Thompson*, 487 U. S., at 859 ((SCALIA, J., dissenting); *Graham* v. *Collins*, 506 U. S. 461, 487 (1993) (THOMAS, J., concurring) (contending that *Woodson* was wrongly decided). In particular, each disagreed with

   To start with the first set of cases: *Roper* and *Graham*
establish that children are constitutionally different from
adults for purposes of sentencing.  Because juveniles have
diminished culpability and greater prospects for reform,
we explained, "they are less deserving of the most severe
punishments."  *Graham*, 560 U. S., at ___ (slip op., at 17).
Those cases relied on three significant gaps between juve-
niles and adults.  First, children have a "'lack of maturity
and an underdeveloped sense of responsibility,'" leading to
recklessness, impulsivity, and heedless risk-taking.  *Roper*,
543 U. S., at 569.  Second, children "are more vulner-
able . . . to negative influences and outside pressures,"
including from their family and peers; they have limited
"contro[l] over their own environment" and lack the ability
to extricate themselves from horrific, crime-producing
settings.  *Ibid.*  And third, a child's character is not as
"well formed" as an adult's; his traits are "less fixed" and
his actions less likely to be "evidence of irretrievabl[e]
deprav[ity]."  *Id.,* at 570.

   Our decisions rested not only on common sense—on
what "any parent knows"—but on science and social sci-
ence as well.  *Id.,* at 569.  In *Roper*, we cited studies
showing that "'[o]nly a relatively small proportion of adoles-
cents'" who engage in illegal activity "'develop entrenched
patterns of problem behavior.'"  *Id.,* at 570 (quoting Stein-
berg & Scott, Less Guilty by Reason of Adolescence: De-
velopmental Immaturity, Diminished Responsibility, and
the Juvenile Death Penalty, 58 Am. Psychologist 1009,

_____

the majority's reasoning in *Graham*, which is the foundation stone of
our analysis.  See *Graham*, 560 U. S., at ___ (ROBERTS, C. J., concurring
in judgment) (slip op., at 1); *id.,* at ___ (THOMAS, J., joined by SCALIA
and ALITO, JJ., dissenting) (slip op., at 1–25); *id.,* at ___ (ALITO, J.,
dissenting) (slip op., at 1). While the dissents seek to relitigate old
Eighth Amendment battles, repeating many arguments this Court has
previously (and often) rejected, we apply the logic of *Roper*, *Graham*,
and our individualized sentencing decisions to these two cases.

1014 (2003)). And in *Graham*, we noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"—for example, in "parts of the brain involved in behavior control." 560 U. S., at \_\_\_ (slip op., at 17).[5] We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's "moral culpability" and enhanced the prospect that, as the years go by and neurological development occurs, his "'deficiencies will be reformed.'" *Id.,* at \_\_\_ (slip op., at 18) (quoting *Roper*, 543 U. S., at 570).

*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because "'[t]he heart of the retribution rationale'" relates to an offender's blameworthiness, "'the case for retribution is not as strong with a minor as with an adult.'" *Graham*, 560 U. S., at \_\_\_ (slip op., at 20–21) (quoting *Tison* v. *Arizona*, 481 U. S. 137, 149 (1987); *Roper*, 543 U. S., at 571). Nor can deterrence do the work in this context, because "'the same characteristics that render juveniles less culpable than adults'"—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punish-

———————

[5]The evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger. See, *e.g.,* Brief for American Psychological Association et al. as *Amici Curiae* 3 ("[A]n ever-growing body of research in developmental psychology and neuroscience continues to confirm and strengthen the Court's conclusions"); *id.,* at 4 ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance"); Brief for J. Lawrence Aber et al. as *Amici Curiae* 12–28 (discussing post-*Graham* studies); *id.,* at 26–27 ("Numerous studies post-*Graham* indicate that exposure to deviant peers leads to increased deviant behavior and is a consistent predictor of adolescent delinquency" (footnote omitted)).

ment. *Graham*, 560 U. S., at ___ (slip op., at 21) (quoting
*Roper*, 543 U. S., at 571). Similarly, incapacitation could
not support the life-without-parole sentence in *Graham*:
Deciding that a "juvenile offender forever will be a danger
to society" would require "mak[ing] a judgment that [he]
is incorrigible"—but "'incorrigibility is inconsistent with
youth.'" 560 U. S., at ___ (slip op., at 22) (quoting *Work-
man* v. *Commonwealth*, 429 S. W. 2d 374, 378 (Ky. App.
1968)). And for the same reason, rehabilitation could not
justify that sentence. Life without parole "forswears
altogether the rehabilitative ideal." *Graham*, 560 U. S., at
___ (slip op., at 23). It reflects "an irrevocable judgment
about [an offender's] value and place in society," at odds
with a child's capacity for change. *Ibid.*

*Graham* concluded from this analysis that life-without-
parole sentences, like capital punishment, may violate
the Eighth Amendment when imposed on children. To be
sure, *Graham*'s flat ban on life without parole applied only
to nonhomicide crimes, and the Court took care to distin-
guish those offenses from murder, based on both moral
culpability and consequential harm. See *id.,* at ___ (slip
op., at 18). But none of what it said about children—about
their distinctive (and transitory) mental traits and en-
vironmental vulnerabilities—is crime-specific. Those
features are evident in the same way, and to the same de-
gree, when (as in both cases here) a botched robbery turns
into a killing. So *Graham*'s reasoning implicates any life-
without-parole sentence imposed on a juvenile, even as its
categorical bar relates only to nonhomicide offenses.

Most fundamentally, *Graham* insists that youth matters
in determining the appropriateness of a lifetime of incar-
ceration without the possibility of parole. In the circum-
stances there, juvenile status precluded a life-without-
parole sentence, even though an adult could receive it for a
similar crime. And in other contexts as well, the charac-
teristics of youth, and the way they weaken rationales for

punishment, can render a life-without-parole sentence disproportionate. Cf. *id.,* at \_\_\_ (slip op., at 20–23) (generally doubting the penological justifications for imposing life without parole on juveniles). "An offender's age," we made clear in *Graham*, "is relevant to the Eighth Amendment," and so "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Id.,* at \_\_\_ (slip op., at 25). THE CHIEF JUSTICE, concurring in the judgment, made a similar point. Although rejecting a categorical bar on life-without-parole sentences for juveniles, he acknowledged "*Roper*'s conclusion that juveniles are typically less culpable than adults," and accordingly wrote that "an offender's juvenile status can play a central role" in considering a sentence's proportionality. *Id.,* at \_\_\_ (slip op., at 5–6); see *id.,* at \_\_\_ (slip op., at 12) (Graham's "youth is one factor, among others, that should be considered in deciding whether his punishment was unconstitutionally excessive").[6]

But the mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations. By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's

---

[6] In discussing *Graham*, the dissents essentially ignore all of this reasoning. See *post,* at 3–6 (opinion of ROBERTS, C. J.); *post,* at 4 (opinion of ALITO, J.). Indeed, THE CHIEF JUSTICE ignores the points made in his own concurring opinion. The only part of *Graham* that the dissents see fit to note is the distinction it drew between homicide and nonhomicide offenses. See *post,* at 7–8 (opinion of ROBERTS, C. J.); *post,* at 4 (opinion of ALITO, J.). But contrary to the dissents' charge, our decision today retains that distinction: *Graham* established one rule (a flat ban) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses.

most severe penalties on juvenile offenders cannot proceed
as though they were not children.

And *Graham* makes plain these mandatory schemes'
defects in another way: by likening life-without-parole
sentences imposed on juveniles to the death penalty itself.
Life-without-parole terms, the Court wrote, "share some
characteristics with death sentences that are shared by no
other sentences." 560 U. S*.,* at ___ (slip op., at 19). Im-
prisoning an offender until he dies alters the remainder of
his life "by a forfeiture that is irrevocable." *Ibid.* (citing
*Solem* v. *Helm*, 463 U. S. 277, 300–301 (1983)). And this
lengthiest possible incarceration is an "especially harsh
punishment for a juvenile," because he will almost inevi-
tably serve "more years and a greater percentage of his life
in prison than an adult offender." *Graham*, 560 U. S., at
___ (slip op., at 19–20). The penalty when imposed on a
teenager, as compared with an older person, is therefore
"the same . . . in name only." *Id.,* at ___ (slip op., at 20).
All of that suggested a distinctive set of legal rules: In part
because we viewed this ultimate penalty for juveniles as
akin to the death penalty, we treated it similarly to that
most severe punishment. We imposed a categorical ban on
the sentence's use, in a way unprecedented for a term of
imprisonment. See *id.,* at ___ (slip op., at 9); *id.,* at ___
(THOMAS, J., dissenting) (slip op., at 7) ("For the first time
in its history, the Court declares an entire class of offend-
ers immune from a noncapital sentence using the categori-
cal approach it previously reserved for death penalty cases
alone"). And the bar we adopted mirrored a proscription
first established in the death penalty context—that the
punishment cannot be imposed for any nonhomicide
crimes against individuals. See *Kennedy*, 554 U. S. 407;
*Coker* v. *Georgia*, 433 U. S. 584 (1977).

That correspondence—*Graham*'s "[t]reat[ment] [of]
juvenile life sentences as analogous to capital punish-
ment," 560 U. S., at ___ (ROBERTS, C. J., concurring in

judgment) (slip op., at 5)—makes relevant here a second line of our precedents, demanding individualized sentencing when imposing the death penalty. In *Woodson*, 428 U. S. 280, we held that a statute mandating a death sentence for first-degree murder violated the Eighth Amendment. We thought the mandatory scheme flawed because it gave no significance to "the character and record of the individual offender or the circumstances" of the offense, and "exclud[ed] from consideration . . . the possibility of compassionate or mitigating factors." *Id.,* at 304. Subsequent decisions have elaborated on the requirement that capital defendants have an opportunity to advance, and the judge or jury a chance to assess, any mitigating factors, so that the death penalty is reserved only for the most culpable defendants committing the most serious offenses. See, *e.g., Sumner* v. *Shuman*, 483 U. S. 66, 74–76 (1987); *Eddings* v. *Oklahoma*, 455 U. S. 104, 110–112 (1982); *Lockett*, 438 U. S., at 597–609 (plurality opinion).

Of special pertinence here, we insisted in these rulings that a sentencer have the ability to consider the "mitigating qualities of youth." *Johnson* v. *Texas*, 509 U. S. 350, 367 (1993). Everything we said in *Roper* and *Graham* about that stage of life also appears in these decisions. As we observed, "youth is more than a chronological fact." *Eddings*, 455 U. S., at 115. It is a time of immaturity, irresponsibility, "impetuousness[,] and recklessness." *Johnson,* 509 U. S., at 368. It is a moment and "condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings,* 455 U. S., at 115. And its "signature qualities" are all "transient." *Johnson*, 509 U. S., at 368. *Eddings* is especially on point. There, a 16-year-old shot a police officer point-blank and killed him. We invalidated his death sentence because the judge did not consider evidence of his neglectful and violent family background (including his mother's drug abuse and his father's physical abuse) and his emotional disturbance.

We found that evidence "particularly relevant"—more so than it would have been in the case of an adult offender. 455 U. S., at 115. We held: "[J]ust as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered" in assessing his culpability. *Id.,* at 116.

In light of *Graham*'s reasoning, these decisions too show the flaws of imposing mandatory life-without-parole sentences on juvenile homicide offenders. Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one. And still worse, each juvenile (including these two 14-year-olds) will receive the same sentence as the vast majority of adults committing similar homicide offenses—but really, as *Graham* noted, a *greater* sentence than those adults will serve.[7] In meting out the death penalty, the elision of all these differences would be strictly forbidden. And once again, *Graham* indicates that a similar rule should apply when a juvenile confronts a sentence of life (and death) in prison.

So *Graham* and *Roper* and our individualized sentenc-

_____

[7] Although adults are subject as well to the death penalty in many jurisdictions, very few offenders actually receive that sentence. See, *e.g.,* Dept. of Justice, Bureau of Justice Statistics, S. Rosenmerkel, M. Durose, & D. Farole, Felony Sentences in State Courts 2006—Statistical Tables, p. 28 (Table 4.4) (rev. Nov. 22, 2010). So in practice, the sentencing schemes at issue here result in juvenile homicide offenders receiving the same nominal punishment as almost all adults, even though the two classes differ significantly in moral culpability and capacity for change.

ing cases alike teach that in imposing a State's harshest penalties, a sentencer misses too much if he treats every child as an adult. To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. See, *e.g., Graham*, 560 U. S., at \_\_\_ (slip op., at 27) ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings"); *J. D. B.* v. *North Carolina*, 564 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 5–6) (discussing children's responses to interrogation). And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

Both cases before us illustrate the problem. Take Jackson's first. As noted earlier, Jackson did not fire the bullet that killed Laurie Troup; nor did the State argue that he intended her death. Jackson's conviction was instead based on an aiding-and-abetting theory; and the appellate court affirmed the verdict only because the jury could have believed that when Jackson entered the store, he warned Troup that "[w]e ain't playin'," rather than told his friends that "I thought you all was playin'." See 359 Ark., at 90–92, 194 S. W. 3d, at 759–760; *supra,* at 2. To be sure, Jackson learned on the way to the video store that his

friend Shields was carrying a gun, but his age could well
have affected his calculation of the risk that posed, as well
as his willingness to walk away at that point. All these
circumstances go to Jackson's culpability for the offense.
See *Graham*, 560 U. S., at ___ (slip op., at 18) ("[W]hen
compared to an adult murderer, a juvenile offender who
did not kill or intend to kill has a twice diminished moral
culpability"). And so too does Jackson's family background
and immersion in violence: Both his mother and his
grandmother had previously shot other individuals. See
Record in No. 10–9647, pp. 80–82. At the least, a sen-
tencer should look at such facts before depriving a 14-
year-old of any prospect of release from prison.

That is true also in Miller's case. No one can doubt that
he and Smith committed a vicious murder. But they did it
when high on drugs and alcohol consumed with the adult
victim. And if ever a pathological background might have
contributed to a 14-year-old's commission of a crime, it is
here. Miller's stepfather physically abused him; his alco-
holic and drug-addicted mother neglected him; he had
been in and out of foster care as a result; and he had tried
to kill himself four times, the first when he should have
been in kindergarten. See 928 So. 2d, at 1081 (Cobb, J.,
concurring in result); Miller App. 26–28; *supra,* at 4.
Nonetheless, Miller's past criminal history was limited—
two instances of truancy and one of "second-degree crimi-
nal mischief." No. CR–03–0915, at 6 (unpublished memo-
randum). That Miller deserved severe punishment for
killing Cole Cannon is beyond question. But once again,
a sentencer needed to examine all these circumstances
before concluding that life without any possibility of parole
was the appropriate penalty.

We therefore hold that the Eighth Amendment forbids a
sentencing scheme that mandates life in prison without
possibility of parole for juvenile offenders. Cf. *Graham*,
560 U. S., at ___ (slip op., at 24) ("A State is not required

to guarantee eventual freedom," but must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation"). By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment. Because that holding is sufficient to decide these cases, we do not consider Jackson's and Miller's alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger. But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U. S., at 573; *Graham*, 560 U. S., at \_\_\_ (slip op., at 17). Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.[8]

—————————

[8] Given our holding, and the dissents' competing position, we see a certain irony in their repeated references to 17-year-olds who have committed the "most heinous" offenses, and their comparison of those defendants to the 14-year-olds here. See *post,* at 2 (opinion of ROBERTS, C. J.) (noting the "17-year old [who] is convicted of deliberately murdering an innocent victim"); *post,* at 3 ("the most heinous murders"); *post,* at 7 ("the worst types of murder"); *post,* at 5 (opinion of ALITO, J.) (warning the reader not to be "confused by the particulars" of these two cases); *post,* at 1 (discussing the "17½-year-old who sets off a bomb in a crowded mall"). Our holding requires factfinders to attend to exactly such circumstances—to take into account the differences among de-

## III

Alabama and Arkansas offer two kinds of arguments against requiring individualized consideration before sentencing a juvenile to life imprisonment without possibility of parole. The States (along with the dissents) first contend that the rule we adopt conflicts with aspects of our Eighth Amendment caselaw. And they next assert that the rule is unnecessary because individualized circumstances come into play in deciding whether to try a juvenile offender as an adult. We think the States are wrong on both counts.

## A

The States (along with JUSTICE THOMAS) first claim that *Harmelin* v. *Michigan*, 501 U. S. 957 (1991), precludes our holding. The defendant in *Harmelin* was sentenced to a mandatory life-without-parole term for possessing more than 650 grams of cocaine. The Court upheld that penalty, reasoning that "a sentence which is not otherwise cruel and unusual" does not "becom[e] so simply because it is 'mandatory.'" *Id.,* at 995. We recognized that a different rule, requiring individualized sentencing, applied in the death penalty context. But we refused to extend that command to noncapital cases "because of the qualitative difference between death and all other penalties." *Ibid.*; see *id.,* at 1006 (KENNEDY, J., concurring in part and concurring in judgment). According to Alabama, invalidating the mandatory imposition of life-without-parole terms on juveniles "would effectively overrule *Harmelin*." Brief for Respondent in No. 10–9646, p. 59 (hereinafter Alabama Brief); see Arkansas Brief 39.

We think that argument myopic. *Harmelin* had nothing to do with children and did not purport to apply its hold-

_____

fendants and crimes. By contrast, the sentencing schemes that the dissents find permissible altogether preclude considering these factors.

ing to the sentencing of juvenile offenders. We have by now held on multiple occasions that a sentencing rule permissible for adults may not be so for children. Capital punishment, our decisions hold, generally comports with the Eighth Amendment—except it cannot be imposed on children. See *Roper*, 543 U. S. 551; *Thompson*, 487 U. S. 815. So too, life without parole is permissible for nonhomicide offenses—except, once again, for children. See *Graham*, 560 U. S., at ___ (slip op., at 24). Nor are these sentencing decisions an oddity in the law. To the contrary, "'[o]ur history is replete with laws and judicial recognition' that children cannot be viewed simply as miniature adults." *J. D. B.,* 564 U. S., at ___ (slip op., at 10–11) (quoting *Eddings*, 455 U. S., at 115–116, citing examples from criminal, property, contract, and tort law). So if (as *Harmelin* recognized) "death is different," children are different too. Indeed, it is the odd legal rule that does *not* have some form of exception for children. In that context, it is no surprise that the law relating to society's harshest punishments recognizes such a distinction. Cf. *Graham*, 560 U. S., at ___ (ROBERTS, C. J., concurring in judgment) (slip op., at 7) ("Graham's age places him in a significantly different category from the defendan[t] in . . . *Harmelin*"). Our ruling thus neither overrules nor undermines nor conflicts with *Harmelin*.

Alabama and Arkansas (along with THE CHIEF JUSTICE and JUSTICE ALITO) next contend that because many States impose mandatory life-without-parole sentences on juveniles, we may not hold the practice unconstitutional. In considering categorical bars to the death penalty and life without parole, we ask as part of the analysis whether "'objective indicia of society's standards, as expressed in legislative enactments and state practice,'" show a "national consensus" against a sentence for a particular class of offenders. *Graham*, 560 U. S., at ___ (slip op., at 10) (quoting *Roper*, 543 U. S., at 563). By our count, 29 juris-

dictions (28 States and the Federal Government) make a life-without-parole term mandatory for some juveniles convicted of murder in adult court.[9] The States argue that this number precludes our holding.

We do not agree; indeed, we think the States' argument on this score *weaker* than the one we rejected in *Graham*. For starters, the cases here are different from the typical one in which we have tallied legislative enactments. Our decision does not categorically bar a penalty for a class of offenders or type of crime—as, for example, we did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty. And in so requiring, our decision flows straightforwardly from our precedents: specifically, the principle of *Roper, Graham*, and our individualized sentencing cases that youth matters for purposes of meting out the law's most serious punishments. When both of those circumstances have obtained in the past, we have not scrutinized or relied in the same way on legislative

_____

[9] The States note that 26 States and the Federal Government make life without parole the mandatory (or mandatory minimum) punishment for some form of murder, and would apply the relevant provision to 14-year-olds (with many applying it to even younger defendants). See Alabama Brief 17–18. In addition, life without parole is mandatory for older juveniles in Louisiana (age 15 and up) and Texas (age 17). See La. Child. Code Ann., Arts. 857(A), (B) (West Supp. 2012); La. Rev. Stat. Ann. §§14:30(C), 14:30.1(B) (West Supp. 2012); Tex. Family Code Ann. §§51.02(2)(A), 54.02(a)(2)(A) (West Supp. 2011); Tex. Penal Code Ann. §12.31(a) (West 2011). In many of these jurisdictions, life without parole is the mandatory punishment only for aggravated forms of murder. That distinction makes no difference to our analysis. We have consistently held that limiting a mandatory death penalty law to particular kinds of murder cannot cure the law's "constitutional vice" of disregarding the "circumstances of the particular offense and the character and propensities of the offender." *Roberts* v. *Louisiana*, 428 U. S. 325, 333 (1976) (plurality opinion); see *Sumner* v. *Shuman*, 483 U. S. 66 (1987). The same analysis applies here, for the same reasons.

enactments. See, *e.g., Sumner* v. *Shuman*, 483 U. S. 66 (relying on *Woodson*'s logic to prohibit the mandatory death penalty for murderers already serving life without parole); *Lockett*, 438 U. S., at 602–608 (plurality opinion) (applying *Woodson* to require that judges and juries consider all mitigating evidence); *Eddings*, 455 U. S., at 110–117 (similar). We see no difference here.

In any event, the "objective indicia" that the States offer do not distinguish these cases from others holding that a sentencing practice violates the Eighth Amendment. In *Graham*, we prohibited life-without-parole terms for juveniles committing nonhomicide offenses even though 39 jurisdictions permitted that sentence. See 560 U. S., at ___ (slip op., at 11). That is 10 *more* than impose life without parole on juveniles on a mandatory basis.[10] And

——————

[10] In assessing indicia of societal standards, *Graham* discussed "actual sentencing practices" in addition to legislative enactments, noting how infrequently sentencers imposed the statutorily available penalty. 560 U. S., at ___ (slip op., at 11). Here, we consider the constitutionality of mandatory sentencing schemes—which by definition remove a judge's or jury's discretion—so no comparable gap between legislation and practice can exist. Rather than showing whether sentencers consider life without parole for juvenile homicide offenders appropriate, the number of juveniles serving this sentence, see *post,* at 1, 3–4 (ROBERTS, C. J., dissenting), merely reflects the number who have committed homicide in mandatory-sentencing jurisdictions. For the same reason, THE CHIEF JUSTICE's comparison of ratios in this case and *Graham* carries little weight. He contrasts the number of mandatory life-without-parole sentences for juvenile murderers, relative to the number of juveniles arrested for murder, with "the corresponding number" of sentences in *Graham* (*i.e.,* the number of life-without-parole sentences for juveniles who committed serious nonhomicide crimes, as compared to arrests for those crimes). *Post*, at 4. But because the mandatory nature of the sentences here necessarily makes them more common, THE CHIEF JUSTICE's figures do not "correspon[d]" at all. The higher ratio is mostly a function of removing the sentencer's discretion.

Where mandatory sentencing does not itself account for the number of juveniles serving life-without-parole terms, the evidence we have of practice supports our holding. Fifteen jurisdictions make life without

in *Atkins*, *Roper*, and *Thompson*, we similarly banned the death penalty in circumstances in which "less than half" of the "States that permit[ted] capital punishment (for whom the issue exist[ed])" had previously chosen to do so. *Atkins*, 536 U. S., at 342 (SCALIA, J., dissenting) (emphasis deleted); see *id.,* at 313–315 (majority opinion); *Roper*, 543 U. S., at 564–565; *Thompson*, 487 U. S., at 826–827 (plurality opinion).  So we are breaking no new ground in these cases.[11]

*Graham* and *Thompson* provide special guidance, because they considered the same kind of statutes we do and

———————

parole discretionary for juveniles.  See Alabama Brief 25 (listing 12 States); Cal. Penal Code Ann. §190.5(b) (West 2008); Ind. Code §35–50–2–3(b) (2011); N. M. Stat. §§31–18–13(B), 31–18–14, 31–18–15.2 (2010). According to available data, only about 15% of all juvenile life-without-parole sentences come from those 15 jurisdictions, while 85% come from the 29 mandatory ones.  See Tr. of Oral Arg. in No. 10–9646, p. 19; Human Rights Watch, State Distribution of Youth Offenders Serving Juvenile Life Without Parole (JLWOP), Oct. 2, 2009, online at http://www.hrw.org/news/2009/10/02/state-distribution-juvenile-offenders-serving-juvenile-life-without-parole (as visited June 21, 2012, and available in Clerk of Court's case file).  That figure indicates that when given the choice, sentencers impose life without parole on children relatively rarely.  And contrary to THE CHIEF JUSTICE's argument, see *post*, at 5, n. 2, we have held that when judges and juries do not often choose to impose a sentence, it at least should not be mandatory.  See *Woodson* v. *North Carolina*, 428 U. S. 280, 295–296 (1976) (plurality opinion) (relying on the infrequency with which juries imposed the death penalty when given discretion to hold that its mandatory imposition violates the Eighth Amendment).

[11] In response, THE CHIEF JUSTICE complains: "To say that a sentence may be considered unusual *because* so many legislatures approve it stands precedent on its head."  *Post,* at 5.  To be clear: That description in no way resembles our opinion.  We hold that the sentence violates the Eighth Amendment because, as we have exhaustively shown, it conflicts with the fundamental principles of *Roper*, *Graham*, and our individualized sentencing cases.  We then show why the number of States imposing this punishment does not preclude our holding, and note how its mandatory nature (in however many States adopt it) makes use of actual sentencing numbers unilluminating.

explained why simply counting them would present a distorted view. Most jurisdictions authorized the death penalty or life without parole for juveniles only through the combination of two independent statutory provisions. One allowed the transfer of certain juvenile offenders to adult court, while another (often in a far-removed part of the code) set out the penalties for any and all individuals tried there. We reasoned that in those circumstances, it was impossible to say whether a legislature had endorsed a given penalty for children (or would do so if presented with the choice). In *Thompson*, we found that the statutes "t[old] us that the States consider 15-year-olds to be old enough to be tried in criminal court for serious crimes (or too old to be dealt with effectively in juvenile court), but t[old] us nothing about the judgment these States have made regarding the appropriate punishment for such youthful offenders." 487 U. S., at 826, n. 24 (plurality opinion) (emphasis deleted); see also *id.,* at 850 (O'Connor, J., concurring in judgment); *Roper*, 543 U. S., at 596, n. (O'Connor, J., dissenting). And *Graham* echoed that reasoning: Although the confluence of state laws "ma[de] life without parole possible for some juvenile nonhomicide offenders," it did not "justify a judgment" that many States actually "intended to subject such offenders" to those sentences. 560 U. S., at \_\_\_ (slip op., at 16).[12]

All that is just as true here. Almost all jurisdictions allow some juveniles to be tried in adult court for some

--------

[12] THE CHIEF JUSTICE attempts to distinguish *Graham* on this point, arguing that there "the extreme rarity with which the sentence in question was imposed could suggest that legislatures did not really intend the inevitable result of the laws they passed." *Post*, at 6. But neither *Graham* nor *Thompson* suggested such reasoning, presumably because the time frame makes it difficult to comprehend. Those cases considered what legislators intended when they enacted, at different moments, separate juvenile-transfer and life-without-parole provisions—by definition, before they knew or could know how many juvenile life-without-parole sentences would result.

kinds of homicide. See Dept. of Justice, H. Snyder & M.
Sickmund, Juvenile Offenders and Victims: 2006 National
Report 110–114 (hereinafter 2006 National Report). But
most States do not have separate penalty provisions for
those juvenile offenders. Of the 29 jurisdictions mandat-
ing life without parole for children, more than half do so
by virtue of generally applicable penalty provisions, im-
posing the sentence without regard to age.[13] And indeed,
some of those States set no minimum age for who may be
transferred to adult court in the first instance, thus apply-
ing life-without-parole mandates to children of any age—
be it 17 or 14 or 10 or 6.[14] As in *Graham*, we think that
"underscores that the statutory eligibility of a juvenile
offender for life without parole does not indicate that the
penalty has been endorsed through deliberate, express,
and full legislative consideration." 560 U. S., at ___ (slip

_____

[13] See Ala. Code §§13A–5–45(f), 13A–6–2(c) (2005 and Cum. Supp.
2011); Ariz. Rev. Stat. Ann. §13–752 (West 2010), §41–1604.09(I) (West
2011); Conn. Gen. Stat. §53a–35a(1) (2011); Del. Code Ann., Tit. 11,
§4209(a) (2007); Fla. Stat. §775.082(1) (2010); Haw. Rev. Stat. §706–
656(1) (1993); Idaho Code §18–4004 (Lexis 2004); Mich. Comp. Laws
Ann. §791.234(6)(a) (West Cum. Supp. 2012); Minn. Stat. Ann.
§§609.106, subd. 2 (West 2009); Neb. Rev. Stat. §29–2522 (2008); N. H.
Rev. Stat. Ann. §630:1–a (West 2007); 18 Pa. Cons. Stat. §§1102(a), (b),
61 Pa. Cons. Stat. §6137(a)(1) (Supp. 2012); S. D. Codified Laws §22-6-
1(1) (2006), §24–15–4 (2004); Vt. Stat. Ann., Tit. 13, §2311(c)(2009);
Wash. Rev. Code §10.95.030(1) (2010).

[14] See Del. Code Ann., Tit. 10, §1010 (1999 and Cum. Supp. 2010), Tit.
11, §4209(a) (2007); Fla. Stat. §985.56 (2010), 775.082(1); Haw. Rev.
Stat. §571–22(d) (1993), §706–656(1); Idaho Code §§20–508, 20–509
(Lexis Cum. Supp. 2012), §18–4004; Mich. Comp. Laws Ann. §712A.2d
(West 2009), §791.234(6)(a); Neb. Rev. Stat. §§43–247, 29–2522 (2008);
42 Pa. Cons. Stat. §6355(e) (2000), 18 Pa. Cons. Stat. §1102. Other
States set ages between 8 and 10 as the minimum for transfer, thus
exposing those young children to mandatory life without parole. See
S. D. Codified Laws §§26–8C–2, 26–11–4 (2004), §22–6–1 (age 10); Vt.
Stat. Ann., Tit. 33, §5204 (2011 Cum. Supp.), Tit. 13, §2311(a) (2009)
(age 10); Wash. Rev. Code §§9A.04.050, 13.40.110 (2010), §10.95.030
(age 8).

op., at 16). That Alabama and Arkansas can count to 29 by including these possibly (or probably) inadvertent legislative outcomes does not preclude our determination that mandatory life without parole for juveniles violates the Eighth Amendment.

## B

Nor does the presence of discretion in some jurisdictions' transfer statutes aid the States here. Alabama and Arkansas initially ignore that many States use mandatory transfer systems: A juvenile of a certain age who has committed a specified offense will be tried in adult court, regardless of any individualized circumstances. Of the 29 relevant jurisdictions, about half place at least some juvenile homicide offenders in adult court automatically, with no apparent opportunity to seek transfer to juvenile court.[15] Moreover, several States at times lodge this decision exclusively in the hands of prosecutors, again with no statutory mechanism for judicial reevaluation.[16] And those "prosecutorial discretion laws are usually silent regarding standards, protocols, or appropriate considerations for decisionmaking." Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, P. Griffin, S. Addie, B. Adams, & K. Firestine, Trying Juveniles as

———————

[15]See Ala. Code §12–15–204(a) (Cum. Supp. 2011); Ariz. Rev. Stat. Ann. §13–501(A) (West Cum. Supp. 2011); Conn. Gen. Stat. §46b–127 (2011); Ill. Comp. Stat. ch. 705, §§405/5–130(1)(a), (4)(a) (West 2010); La. Child. Code Ann., Art. 305(A) (West Cum. Supp. 2012); Mass. Gen. Laws, ch. 119, §74 (West 2010); Mich. Comp. Laws Ann. §712A.2(a) (West 2002); Minn. Stat. Ann. §260B.007, subd. 6(b) (West Cum. Supp. 2011), §260B.101, subd. 2 (West 2007); Mo. Rev. Stat. §§211.021(1), (2) (2011); N. C. Gen. Stat. Ann. §§7B–1501(7), 7B–1601(a), 7B–2200 (Lexis 2011); N. H. Rev. Stat. Ann. §169–B:2(IV) (West Cum. Supp. 2011), §169–B:3 (West 2010); Ohio Rev. Code Ann. §2152.12(A)(1)(a) (Lexis 2011); Tex. Family Code Ann. §51.02(2); Va. Code Ann. §§16.1–241(A), 16.1–269.1(B), (D) (Lexis 2010).

[16]Fla. Stat. Ann. §985.557(1) (West Supp. 2012); Mich. Comp. Laws Ann. §712A.2(a)(1); Va. Code Ann. §§16.1–241(A), 16.1–269.1(C), (D).

Adults: An Analysis of State Transfer Laws and Reporting 5 (2011).

Even when States give transfer-stage discretion to judges, it has limited utility. First, the decisionmaker typically will have only partial information at this early, pretrial stage about either the child or the circumstances of his offense. Miller's case provides an example. As noted earlier, see n. 3, *supra*, the juvenile court denied Miller's request for his own mental-health expert at the transfer hearing, and the appeals court affirmed on the ground that Miller was not then entitled to the protections and services he would receive at trial. See No. CR–03–0915, at 3–4 (unpublished memorandum). But by then, of course, the expert's testimony could not change the sentence; whatever she said in mitigation, the mandatory life-without-parole prison term would kick in. The key moment for the exercise of discretion is the transfer—and as Miller's case shows, the judge often does not know then what she will learn, about the offender or the offense, over the course of the proceedings.

Second and still more important, the question at transfer hearings may differ dramatically from the issue at a post-trial sentencing. Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions often present a choice between extremes: light punishment as a child or standard sentencing as an adult (here, life without parole). In many States, for example, a child convicted in juvenile court must be released from custody by the age of 21. See, *e.g.,* Ala. Code §12–15–117(a) (Cum. Supp. 2011); see generally 2006 National Report 103 (noting limitations on the length of juvenile court sanctions). Discretionary sentencing in adult court would provide different options: There, a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term *with* the possibility of parole or a lengthy term of years. It is easy

to imagine a judge deciding that a minor deserves a (much) harsher sentence than he would receive in juvenile court, while still not thinking life-without-parole appropriate. For that reason, the discretion available to a judge at the transfer stage cannot substitute for discretion at post-trial sentencing in adult court—and so cannot satisfy the Eighth Amendment.

## IV

*Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment. We accordingly reverse the judgments of the Arkansas Supreme Court and Alabama Court of Criminal Appeals and remand the cases for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

—————

Nos. 10–9646 and 10–9647

—————

EVAN MILLER, PETITIONER
10–9646                    *v.*
ALABAMA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF ALABAMA

KUNTRELL JACKSON, PETITIONER
10–9647                    *v.*
RAY HOBBS, DIRECTOR, ARKANSAS
DEPARTMENT OF CORRECTION

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF ARKANSAS

[June 25, 2012]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR joins, concurring.

I join the Court's opinion in full. I add that, if the State continues to seek a sentence of life without the possibility of parole for Kuntrell Jackson, there will have to be a determination whether Jackson "kill[ed] or intend[ed] to kill" the robbery victim. *Graham* v. *Florida*, 560 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 18). In my view, without such a finding, the Eighth Amendment as interpreted in *Graham* forbids sentencing Jackson to such a sentence, regardless of whether its application is mandatory or discretionary under state law.

In *Graham* we said that "when compared to an adult murderer, a juvenile offender *who did not kill or intend to kill* has a twice diminished moral culpability." *Ibid.* (emphasis added). For one thing, "compared to adults, juveniles have a lack of maturity and an underdeveloped sense

of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and their characters are not as well formed." *Id.,* at ___ (slip op., at 17) (internal quotation marks omitted). See also *ibid.* ("[P]sychology and brain science continue to show fundamental differences between juvenile and adult minds" making their actions "less likely to be evidence of 'irretrievably depraved character' than are the actions of adults" (quoting *Roper* v. *Simmons*, 543 U. S. 551, 570 (2005))); *ante,* at 8–9. For another thing, *Graham* recognized that lack of intent normally diminishes the "moral culpability" that attaches to the crime in question, making those that do not intend to kill "categorically less deserving of the most serious forms of punishment than are murderers." 560 U. S., at ___ (slip op., at 18) (citing *Kennedy* v. *Louisiana*, 554 U. S. 407, 434–435 (2008); *Enmund* v. *Florida*, 458 U. S. 782 (1982); *Tison* v. *Arizona*, 481 U. S. 137 (1987)). And we concluded that, because of this "twice diminished moral culpability," the Eighth Amendment forbids the imposition upon juveniles of a sentence of life without parole for nonhomicide cases. *Graham*, *supra*, at ___, ___ (slip op., at 18, 32).

Given *Graham'*s reasoning, the kinds of homicide that can subject a juvenile offender to life without parole must exclude instances where the juvenile himself neither kills nor intends to kill the victim. Quite simply, if the juvenile either kills or intends to kill the victim, he lacks "twice diminished" responsibility. But where the juvenile neither kills nor intends to kill, both features emphasized in *Graham* as extenuating apply. The dissent itself here would permit life without parole for "juveniles who commit the worst types of murder," *post,* at 7 (opinion of ROBERTS, C. J.), but that phrase does not readily fit the culpability of one who did not himself kill or intend to kill.

I recognize that in the context of felony-murder cases, the question of intent is a complicated one. The felony-

murder doctrine traditionally attributes death caused in the course of a felony to all participants who intended to commit the felony, regardless of whether they killed or intended to kill. See 2 W. LaFave, Substantive Criminal Law §§14.5(a) and (c) (2d ed. 2003). This rule has been based on the idea of "transferred intent"; the defendant's intent to commit the felony satisfies the intent to kill required for murder. See S. Kadish, S. Schulhofer, & C. Streiker, Criminal Law and Its Processes 439 (8th ed. 2007); 2 C. Torcia, Wharton's Criminal Law §147 (15th ed. 1994).

But in my opinion, this type of "transferred intent" is not sufficient to satisfy the intent to murder that could subject a juvenile to a sentence of life without parole. As an initial matter, this Court has made clear that this artificially constructed kind of intent does not count as intent for purposes of the Eighth Amendment. We do not rely on transferred intent in determining if an adult may receive the death penalty. Thus, the Constitution forbids imposing capital punishment upon an aider and abettor in a robbery, where that individual did not intend to kill and simply was "in the car by the side of the road . . . , waiting to help the robbers escape." *Enmund, supra,* at 788. Cf. *Tison, supra,* at 157–158 (capital punishment permissible for aider and abettor where kidnaping led to death because he was "actively involved" in every aspect of the kidnaping and his behavior showed "a reckless disregard for human life"). Given *Graham,* this holding applies to juvenile sentences of life without parole *a fortiori.* See *ante,* at 12–13. Indeed, even juveniles who meet the *Tison* standard of "reckless disregard" may not be eligible for life without parole. Rather, *Graham* dictates a clear rule: The only juveniles who may constitutionally be sentenced to life without parole are those convicted of homicide offenses who "kill or intend to kill." 560 U. S., at \_\_\_ (slip op., at 18).

Moreover, regardless of our law with respect to adults, there is no basis for imposing a sentence of life without parole upon a juvenile who did not himself kill or intend to kill. At base, the theory of transferring a defendant's intent is premised on the idea that one engaged in a dangerous felony should understand the risk that the victim of the felony could be killed, even by a confederate. See 2 LaFave, *supra*, §14.5(c). Yet the ability to consider the full consequences of a course of action and to adjust one's conduct accordingly is precisely what we know juveniles lack capacity to do effectively. *Ante*, at 8–9. Justice Frankfurter cautioned, "Legal theories and their phrasing in other cases readily lead to fallacious reasoning if uncritically transferred to a determination of a State's duty toward children." *May* v. *Anderson*, 345 U. S. 528, 536 (1953) (concurring opinion). To apply the doctrine of transferred intent here, where the juvenile did not kill, to sentence a juvenile to life without parole would involve such "fallacious reasoning." *Ibid.*

This is, as far as I can tell, precisely the situation present in Kuntrell Jackson's case. Jackson simply went along with older boys to rob a video store. On the way, he became aware that a confederate had a gun. He initially stayed outside the store, and went in briefly, saying something like "We ain't playin'" or "'I thought you all was playin,'" before an older confederate shot and killed the store clerk. *Jackson* v. *State*, 359 Ark. 87, 91, 194 S. W. 3d 757, 760 (2004). Crucially, the jury found him guilty of first-degree murder under a statute that permitted them to convict if, Jackson "attempted to commit or committed an aggravated robbery, and, in the course of that offense, he, or an accomplice, caused [the clerk's] death under circumstance manifesting extreme indifference to the value of human life." *Ibid.* See Ark. Code Ann. §5–10–101(a)(1) (1997); *ante,* at 15. Thus, to be found guilty, Jackson did not need to kill the clerk (it is conceded he did

not), nor did he need to have intent to kill or even "extreme indifference." As long as one of the teenage accomplices in the robbery acted with extreme indifference to the value of human life, Jackson could be convicted of capital murder. *Ibid.*

The upshot is that Jackson, who did not kill the clerk, might not have intended to do so either. See *Jackson* v. *Norris*, 2011 Ark. 49, at 10, ___ S. W. 3d ___ (Danielson, J., dissenting) ("[A]ny evidence of [Jackson's] intent to kill was severely lacking"). In that case, the Eighth Amendment simply forbids imposition of a life term without the possibility of parole. If, on remand, however, there is a finding that Jackson did intend to cause the clerk's death, the question remains open whether the Eighth Amendment prohibits the imposition of life without parole upon a juvenile in those circumstances as well. *Ante,* at 17.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 10–9646 and 10–9647

————————

EVAN MILLER, PETITIONER
10–9646            *v.*
ALABAMA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF ALABAMA

KUNTRELL JACKSON, PETITIONER
10–9647            *v.*
RAY HOBBS, DIRECTOR, ARKANSAS
DEPARTMENT OF CORRECTION

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF ARKANSAS

[June 25, 2012]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA, JUSTICE THOMAS, and JUSTICE ALITO join, dissenting.

Determining the appropriate sentence for a teenager convicted of murder presents grave and challenging questions of morality and social policy. Our role, however, is to apply the law, not to answer such questions. The pertinent law here is the Eighth Amendment to the Constitution, which prohibits "cruel and unusual punishments." Today, the Court invokes that Amendment to ban a punishment that the Court does not itself characterize as unusual, and that could not plausibly be described as such. I therefore dissent.

The parties agree that nearly 2,500 prisoners are presently serving life sentences without the possibility of parole for murders they committed before the age of 18. Brief for Petitioner in No. 10–9647, p. 62, n. 80 (Jackson

Brief); Brief for Respondent in No. 10–9646, p. 30 (Alabama Brief). The Court accepts that over 2,000 of those prisoners received that sentence because it was mandated by a legislature. *Ante,* at 22, n. 10. And it recognizes that the Federal Government and most States impose such mandatory sentences. *Ante,* at 19–20. Put simply, if a 17-year-old is convicted of deliberately murdering an innocent victim, it is not "unusual" for the murderer to receive a mandatory sentence of life without parole. That reality should preclude finding that mandatory life imprisonment for juvenile killers violates the Eighth Amendment.

Our precedent supports this conclusion. When determining whether a punishment is cruel and unusual, this Court typically begins with "'objective indicia of society's standards, as expressed in legislative enactments and state practice.'" *Graham* v. *Florida*, 560 U. S. ___, ___ (2010) (slip op., at 10); see also, *e.g., Kennedy* v. *Louisiana*, 554 U. S. 407, 422 (2008); *Roper* v. *Simmons*, 543 U. S. 551, 564 (2005). We look to these "objective indicia" to ensure that we are not simply following our own subjective values or beliefs. *Gregg* v. *Georgia*, 428 U. S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). Such tangible evidence of societal standards enables us to determine whether there is a "consensus against" a given sentencing practice. *Graham*, *supra,* at ___ (slip op., at 10). If there is, the punishment may be regarded as "unusual." But when, as here, most States formally require and frequently impose the punishment in question, there is no objective basis for that conclusion.

Our Eighth Amendment cases have also said that we should take guidance from "evolving standards of decency that mark the progress of a maturing society." *Ante,* at 6 (quoting *Estelle* v. *Gamble*, 429 U. S. 97, 102 (1976); internal quotation marks omitted). Mercy toward the guilty can be a form of decency, and a maturing society may abandon harsh punishments that it comes to view as

unnecessary or unjust. But decency is not the same as leniency. A decent society protects the innocent from violence. A mature society may determine that this requires removing those guilty of the most heinous murders from its midst, both as protection for its other members and as a concrete expression of its standards of decency. As judges we have no basis for deciding that progress toward greater decency can move only in the direction of easing sanctions on the guilty.

In this case, there is little doubt about the direction of society's evolution: For most of the 20th century, American sentencing practices emphasized rehabilitation of the offender and the availability of parole. But by the 1980's, outcry against repeat offenders, broad disaffection with the rehabilitative model, and other factors led many legislatures to reduce or eliminate the possibility of parole, imposing longer sentences in order to punish criminals and prevent them from committing more crimes. See, *e.g.*, Alschuler, The Changing Purposes of Criminal Punishment, 70 U. Chi. L. Rev. 1, 1–13 (2003); see generally Crime and Public Policy (J. Wilson & J. Petersilia eds. 2011). Statutes establishing life without parole sentences in particular became more common in the past quarter century. See *Baze* v. *Rees*, 553 U. S. 35, 78, and n. 10 (2008) (Stevens, J., concurring in judgment). And the parties agree that most States have changed their laws relatively recently to expose teenage murderers to mandatory life without parole. Jackson Brief 54–55; Alabama Brief 4–5.

The Court attempts to avoid the import of the fact that so many jurisdictions have embraced the sentencing practice at issue by comparing this case to the Court's prior Eighth Amendment cases. The Court notes that *Graham* found a punishment authorized in 39 jurisdictions unconstitutional, whereas the punishment it bans today is mandated in 10 fewer. *Ante,* at 21. But *Graham* went to

considerable lengths to show that although theoretically allowed in many States, the sentence at issue in that case was "exceedingly rare" in practice. 560 U. S., at ___ (slip op., at 16). The Court explained that only 123 prisoners in the entire Nation were serving life without parole for nonhomicide crimes committed as juveniles, with more than half in a single State. It contrasted that with statistics showing nearly 400,000 juveniles were arrested for serious nonhomicide offenses in a single year. Based on the sentence's rarity despite the many opportunities to impose it, *Graham* concluded that there was a national consensus against life without parole for juvenile nonhomicide crimes. *Id.,* at ___ (slip op., at 13–16).

Here the number of mandatory life without parole sentences for juvenile murderers, relative to the number of juveniles arrested for murder, is over 5,000 times higher than the corresponding number in *Graham.* There is thus nothing in this case like the evidence of national consensus in *Graham.*[1]

The Court disregards these numbers, claiming that the prevalence of the sentence in question results from the number of statutes requiring its imposition. *Ante,* at 21, n. 10. True enough. The sentence at issue is statutorily mandated life without parole. Such a sentence can only result from statutes requiring its imposition. In *Graham* the Court relied on the low number of actual sentences to explain why the high number of statutes allowing such

———————

[1] *Graham* stated that 123 prisoners were serving life without parole for nonhomicide offenses committed as juveniles, while in 2007 alone 380,480 juveniles were arrested for serious nonhomicide crimes. 560 U. S., at ___ (slip op., at 13–14). I use 2,000 as the number of prisoners serving mandatory life without parole sentences for murders committed as juveniles, because all seem to accept that the number is at least that high. And the same source *Graham* used reports that 1,170 juveniles were arrested for murder and nonnegligent homicide in 2009. Dept. of Justice, Office of Juvenile Justice and Delinquency Prevention, C. Puzzanchera & B. Adams, Juvenile Arrests 2009, p. 4 (Dec. 2011).

sentences was not dispositive. Here, the Court excuses the high number of actual sentences by citing the high number of statutes imposing it. To say that a sentence may be considered unusual *because* so many legislatures approve it stands precedent on its head.[2]

The Court also advances another reason for discounting the laws enacted by Congress and most state legislatures. Some of the jurisdictions that impose mandatory life without parole on juvenile murderers do so as a result of two statutes: one providing that juveniles charged with serious crimes may be tried as adults, and another generally mandating that those convicted of murder be imprisoned for life. According to the Court, our cases suggest that where the sentence results from the interaction of two such statutes, the legislature can be considered to have imposed the resulting sentences "inadvertent[ly]." *Ante,* at 22–25. The Court relies on *Graham* and *Thompson* v. *Oklahoma*, 487 U. S. 815, 826, n. 24 (1988) (plurality opinion), for the proposition that these laws are therefore not valid evidence of society's views on the punishment at issue.

It is a fair question whether this Court should ever assume a legislature is so ignorant of its own laws that it does not understand that two of them interact with each

_____

[2] The Court's reference to discretionary sentencing practices is a distraction. See *ante,* at 21–22, n. 10. The premise of the Court's decision is that mandatory sentences are categorically different from discretionary ones. So under the Court's own logic, whether discretionary sentences are common or uncommon has nothing to do with whether mandatory sentences are unusual. In any event, if analysis of discretionary sentences were relevant, it would not provide objective support for today's decision. The Court states that "about 15% of all juvenile life-without-parole sentences"—meaning nearly 400 sentences—were imposed at the discretion of a judge or jury. *Ante,* at 22, n. 10. Thus the number of discretionary life without parole sentences for juvenile murderers, relative to the number of juveniles arrested for murder, is about 1,000 times higher than the corresponding number in *Graham*.

other, especially on an issue of such importance as the one before us.  But in *Graham* and *Thompson* it was at least plausible as a practical matter.  In *Graham*, the extreme rarity with which the sentence in question was imposed could suggest that legislatures did not really intend the inevitable result of the laws they passed.  See 560 U. S*.,* at ___ (slip op., at 15–16).  In *Thompson*, the sentencing practice was even rarer—only 20 defendants had received it in the last century.  487 U. S*.,* at 832 (plurality opinion).  Perhaps under those facts it could be argued that the legislature was not fully aware that a teenager could receive the particular sentence in question.  But here the widespread and recent imposition of the sentence makes it implausible to characterize this sentencing practice as a collateral consequence of legislative ignorance.[3]

Nor do we display our usual respect for elected officials by asserting that legislators have *accidentally* required 2,000 teenagers to spend the rest of their lives in jail.  This is particularly true given that our well-publicized decision in *Graham* alerted legislatures to the possibility that teenagers were subject to life with parole only because of legislative inadvertence.  I am aware of no effort in the wake of *Graham* to correct any supposed legislative oversight.  Indeed, in amending its laws in response to *Graham* one legislature made especially clear that it *does* intend juveniles who commit first-degree murder to receive mandatory life without parole.  See Iowa Code Ann. §902.1 (West Cum. Supp. 2012).

In the end, the Court does not actually conclude that mandatory life sentences for juvenile murderers are unusual.  It instead claims that precedent "leads to" today's

_____

[3] The Court claims that I "take issue with some or all of these precedents" and "seek to relitigate" them.  *Ante,* at 7–8, n. 4.  Not so: applying this Court's cases exactly as they stand, I do not believe they support the Court's decision in this case.

ROBERTS, C. J., dissenting

decision, primarily relying on *Graham* and *Roper*. *Ante,* at 7. Petitioners argue that the reasoning of those cases "compels" finding in their favor. Jackson Brief 34. The Court is apparently unwilling to go so far, asserting only that precedent points in that direction. But today's decision invalidates the laws of dozens of legislatures and Congress. This Court is not easily led to such a result. See, *e.g., United States* v. *Harris*, 106 U. S. 629, 635 (1883) (courts must presume an Act of Congress is constitutional "unless the lack of constitutional authority . . . is clearly demonstrated"). Because the Court does not rely on the Eighth Amendment's text or objective evidence of society's standards, its analysis of precedent alone must bear the "heavy burden [that] rests on those who would attack the judgment of the representatives of the people." *Gregg*, 428 U. S., at 175. If the Court is unwilling to say that precedent compels today's decision, perhaps it should reconsider that decision.

In any event, the Court's holding does not follow from *Roper* and *Graham*. Those cases undoubtedly stand for the proposition that teenagers are less mature, less responsible, and less fixed in their ways than adults—not that a Supreme Court case was needed to establish that. What they do not stand for, and do not even suggest, is that legislators—who also know that teenagers are different from adults—may not require life without parole for juveniles who commit the worst types of murder.

That *Graham* does not imply today's result could not be clearer. In barring life without parole for juvenile non-homicide offenders, *Graham* stated that "[t]here is a line 'between homicide and other serious violent offenses against the individual.'" 560 U. S., at ___ (slip op., at 18) (quoting *Kennedy*, 554 U. S., at ___ (slip op., at 27)). The whole point of drawing a line between one issue and another is to say that they are different and should be treated differently. In other words, the two are in different

categories.  Which *Graham* also said: "defendants who do
not kill, intend to kill, or foresee that life will be taken are
*categorically* less deserving of the most serious forms of
punishment than are murderers."  560 U. S., at ___ (slip
op., at 18) (emphasis added).  Of course, to be especially
clear that what is said about one issue does not apply to
another, one could say that the two issues cannot be com-
pared.  *Graham* said that too: "Serious nonhomicide
crimes . . . cannot be compared to murder."  *Ibid.* (internal
quotation marks omitted).  A case that expressly puts an
issue in a different category from its own subject, draws a
line between the two, and states that the two should not
be compared, cannot fairly be said to control that issue.

*Roper* provides even less support for the Court's holding.
In that case, the Court held that the death penalty could
not be imposed for offenses committed by juveniles, no
matter how serious their crimes.  In doing so, *Roper* also
set itself in a different category than this case, by ex-
pressly invoking "special" Eighth Amendment analysis for
death penalty cases.  543 U. S., at 568–569.  But more
importantly, *Roper* reasoned that the death penalty was
not needed to deter juvenile murderers in part because
"life imprisonment without the possibility of parole" was
available.  *Id.*, at 572.  In a classic bait and switch, the
Court now tells state legislatures that—*Roper*'s promise
notwithstanding—they do not have power to guarantee
that once someone commits a heinous murder, he will
never do so again.  It would be enough if today's decision
proved JUSTICE SCALIA's prescience in writing that *Roper*'s
"reassurance . . . gives little comfort."  *Id.,* at 623 (dissent-
ing opinion).  To claim that *Roper* actually "leads to" re-
voking its own reassurance surely goes too far.

Today's decision does not offer *Roper* and *Graham*'s
false promises of restraint.  Indeed, the Court's opinion
suggests that it is merely a way station on the path to
further judicial displacement of the legislative role in

prescribing appropriate punishment for crime. The Court's analysis focuses on the mandatory nature of the sentences in this case. See *ante,* at 11–17. But then— although doing so is entirely unnecessary to the rule it announces—the Court states that even when a life without parole sentence is not mandatory, "we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Ante,* at 17. Today's holding may be limited to mandatory sentences, but the Court has already announced that discretionary life without parole for juveniles should be "uncommon"—or, to use a common synonym, "unusual."

Indeed, the Court's gratuitous prediction appears to be nothing other than an invitation to overturn life without parole sentences imposed by juries and trial judges. If that invitation is widely accepted and such sentences for juvenile offenders do in fact become "uncommon," the Court will have bootstrapped its way to declaring that the Eighth Amendment absolutely prohibits them.

This process has no discernible end point—or at least none consistent with our Nation's legal traditions. *Roper* and *Graham* attempted to limit their reasoning to the circumstances they addressed—*Roper* to the death penalty, and *Graham* to nonhomicide crimes. Having cast aside those limits, the Court cannot now offer a credible substitute, and does not even try. After all, the Court tells us, "none of what [*Graham*] said about children . . . is crime-specific." *Ante,* at 10. The principle behind today's decision seems to be only that because juveniles are different from adults, they must be sentenced differently. See *ante,* at 14–17. There is no clear reason that principle would not bar all mandatory sentences for juveniles, or any juvenile sentence as harsh as what a similarly situated adult would receive. Unless confined, the only stopping point for the Court's analysis would be never permitting juvenile offenders to be tried as adults. Learning that an

Amendment that bars only "unusual" punishments requires the abolition of this uniformly established practice would be startling indeed.

*       *       *

It is a great tragedy when a juvenile commits murder—most of all for the innocent victims. But also for the murderer, whose life has gone so wrong so early. And for society as well, which has lost one or more of its members to deliberate violence, and must harshly punish another. In recent years, our society has moved toward requiring that the murderer, his age notwithstanding, be imprisoned for the remainder of his life. Members of this Court may disagree with that choice. Perhaps science and policy suggest society should show greater mercy to young killers, giving them a greater chance to reform themselves at the risk that they will kill again. See *ante,* at 8–11. But that is not our decision to make. Neither the text of the Constitution nor our precedent prohibits legislatures from requiring that juvenile murderers be sentenced to life without parole. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

Nos. 10–9646 and 10–9647

EVAN MILLER, PETITIONER
10–9646              *v.*
ALABAMA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF ALABAMA

KUNTRELL JACKSON, PETITIONER
10–9647              *v.*
RAY HOBBS, DIRECTOR, ARKANSAS
DEPARTMENT OF CORRECTION

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF ARKANSAS

[June 25, 2012]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

Today, the Court holds that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Ante,* at 2. To reach that result, the Court relies on two lines of precedent. The first involves the categorical prohibition of certain punishments for specified classes of offenders. The second requires individualized sentencing in the capital punishment context. Neither line is consistent with the original understanding of the Cruel and Unusual Punishments Clause. The Court compounds its errors by combining these lines of precedent and extending them to reach a result that is even less legitimate than the foundation on which it is built. Because the Court upsets the legislatively enacted sentencing regimes of 29 jurisdictions without

constitutional warrant, I respectfully dissent.[1]

## I

The Court first relies on its cases "adopt[ing] categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty." *Ante*, at 6–7. Of these categorical proportionality cases, the Court places particular emphasis on *Roper* v. *Simmons*, 543 U. S. 551 (2005), and *Graham* v. *Florida*, 560 U. S. ___ (2010). In *Roper*, the Court held that the Constitution prohibits the execution of an offender who was under 18 at the time of his offense. 543 U. S., at 578. The *Roper* Court looked to, among other things, its own sense of parental intuition and "scientific and sociological studies" to conclude that offenders under the age of 18 "cannot with reliability be classified among the worst offenders." *Id.*, at 569. In *Graham*, the Court relied on similar considerations to conclude that the Constitution prohibits a life-without-parole sentence for a nonhomicide offender who was under the age of 18 at the time of his offense. 560 U. S., at ___ (slip op., at 24).

The Court now concludes that *mandatory* life-without-parole sentences for duly convicted juvenile murderers "contraven[e] *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Ante*, at 11–12. But neither *Roper* nor *Graham* held that specific procedural rules are required for sentencing juvenile homicide offenders. And, the logic of those cases should not be extended to create such a requirement.

The Eighth Amendment, made applicable to the States by the Fourteenth Amendment, provides that: "Excessive

————————

[1] I join THE CHIEF JUSTICE's opinion because it accurately explains that, even accepting the Court's precedents, the Court's holding in today's cases is unsupportable.

bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." As I have previously explained, "the Cruel and Unusual Punishments Clause was originally understood as prohibiting torturous *methods* of punishment—specifically methods akin to those that had been considered cruel and unusual at the time the Bill of Rights was adopted." *Graham*, *supra*, at \_\_\_ (dissenting opinion) (slip op., at 3) (internal quotation marks and citations omitted).[2] The clause does not contain a "proportionality principle." *Ewing* v. *California*, 538 U. S. 11, 32 (2003) (THOMAS, J., concurring in judgment); see generally *Harmelin* v. *Michigan*, 501 U. S. 957, 975–985 (1991) (opinion of SCALIA, J.). In short, it does not authorize courts to invalidate any punishment they deem disproportionate to the severity of the crime or to a particular class of offenders. Instead, the clause "leaves the unavoidably moral question of who 'deserves' a particular nonprohibited method of punishment to the judgment of the legislatures that authorize the penalty." *Graham*, *supra*, at \_\_\_ (THOMAS, J., dissenting) (slip op., at 5).

The legislatures of Arkansas and Alabama, like those of 27 other jurisdictions, *ante*, at 19–20, have determined

———————

[2] Neither the Court nor petitioners argue that petitioners' sentences would have been among "the 'modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted.'" *Graham,* 560 U. S., at \_\_\_ (THOMAS, J., dissenting) (slip op., at 10, n. 3) (quoting *Ford* v. *Wainwright*, 477 U. S. 399, 405 (1986)). Nor could they. Petitioners were 14 years old at the time they committed their crimes. When the Bill of Rights was ratified, 14-year-olds were subject to trial and punishment as adult offenders. See *Roper* v. *Simmons*, 543 U. S. 551, 609, n. 1 (2005) (SCALIA, J., dissenting). Further, mandatory death sentences were common at that time. See *Harmelin* v. *Michigan*, 501 U. S. 957, 994–995 (1991). It is therefore implausible that a 14-year-old's mandatory prison sentence—of any length, with or without parole—would have been viewed as cruel and unusual.

that all offenders convicted of specified homicide offenses, whether juveniles or not, deserve a sentence of life in prison without the possibility of parole. Nothing in our Constitution authorizes this Court to supplant that choice.

## II

To invalidate mandatory life-without-parole sentences for juveniles, the Court also relies on its cases "prohibit[ing] mandatory imposition of capital punishment." *Ante*, at 7. The Court reasons that, because *Graham* compared juvenile life-without-parole sentences to the death penalty, the "distinctive set of legal rules" that this Court has imposed in the capital punishment context, including the requirement of individualized sentencing, is "relevant" here. *Ante*, at 12–13. But even accepting an analogy between capital and juvenile life-without-parole sentences, this Court's cases prohibiting mandatory capital sentencing schemes have no basis in the original understanding of the Eighth Amendment, and, thus, cannot justify a prohibition of sentencing schemes that mandate life-without-parole sentences for juveniles.

## A

In a line of cases following *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*, this Court prohibited the mandatory imposition of the death penalty. See *Woodson* v. *North Carolina*, 428 U. S. 280 (1976) (plurality opinion); *Roberts* v. *Louisiana*, 428 U. S. 325 (1976) (same); *Sumner* v. *Shuman*, 483 U. S. 66 (1987). *Furman* first announced the principle that States may not permit sentencers to exercise unguided discretion in imposing the death penalty. See generally 408 U. S. 238. In response to *Furman*, many States passed new laws that made the death penalty mandatory following conviction of specified crimes, thereby eliminating the offending discretion. See *Gregg* v. *Georgia*, 428 U. S. 153, 180–181 (1976) (joint opinion

of Stewart, Powell, and Stevens, JJ.). The Court invalidated those statutes in *Woodson, Roberts,* and *Sumner*. The Court reasoned that mandatory capital sentencing schemes were problematic, because they failed "to allow the particularized consideration" of "relevant facets of the character and record of the individual offender or the circumstances of the particular offense." *Woodson*, *supra*, at 303–304 (plurality opinion).[3]

In my view, *Woodson* and its progeny were wrongly decided. As discussed above, the Cruel and Unusual Punishments Clause, as originally understood, prohibits "torturous *methods* of punishment." See *Graham*, 560 U. S., at \_\_\_ (THOMAS, J., dissenting) (slip op., at 3) (internal quotation marks omitted). It is not concerned with whether a particular lawful method of punishment— whether capital or noncapital—is imposed pursuant to a mandatory or discretionary sentencing regime. See *Gardner* v. *Florida*, 430 U. S. 349, 371 (1977) (Rehnquist, J., dissenting) ("The prohibition of the Eighth Amendment relates to the character of the punishment, and not to the process by which it is imposed"). In fact, "[i]n the early days of the Republic," each crime generally had a defined punishment "prescribed with specificity by the legislature." *United States* v. *Grayson*, 438 U. S. 41, 45 (1978). Capital sentences, to which the Court analogizes, were

_____

[3] The Court later extended *Woodson*, requiring that capital defendants be permitted to present, and sentencers in capital cases be permitted to consider, any relevant mitigating evidence, including the age of the defendant. See, *e.g., Lockett* v. *Ohio*, 438 U. S. 586, 597–608 (1978) (plurality opinion); *Eddings* v. *Oklahoma*, 455 U. S. 104, 110–112 (1982); *Skipper* v. *South Carolina*, 476 U. S. 1, 4–5 (1986); *Johnson* v. *Texas*, 509 U. S. 350, 361–368 (1993). Whatever the validity of the requirement that sentencers be permitted to consider all mitigating evidence when deciding whether to impose a *nonmandatory* capital sentence, the Court certainly was wrong to prohibit *mandatory* capital sentences. See *Graham* v. *Collins*, 506 U. S. 461, 488–500 (1993) (THOMAS, J., concurring).

treated no differently. "[M]andatory death sentences abounded in our first Penal Code" and were "common in the several States—both at the time of the founding and throughout the 19th century." *Harmelin*, 501 U. S., at 994–995; see also *Woodson*, *supra*, at 289 (plurality opinion) ("At the time the Eighth Amendment was adopted in 1791, the States uniformly followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses"). Accordingly, the idea that the mandatory imposition of an otherwise-constitutional sentence renders that sentence cruel and unusual finds "no support in the text and history of the Eighth Amendment." *Harmelin*, *supra*, at 994.

Moreover, mandatory death penalty schemes were "a perfectly reasonable legislative response to the concerns expressed in *Furman*" regarding unguided sentencing discretion, in that they "eliminat[ed] explicit jury discretion and treat[ed] all defendants equally." *Graham* v. *Collins*, 506 U. S. 461, 487 (1993) (THOMAS, J., concurring). And, as Justice White explained more than 30 years ago, "a State is not constitutionally forbidden to provide that the commission of certain crimes conclusively establishes that a criminal's character is such that he deserves death." *Roberts*, *supra*, at 358 (dissenting opinion). Thus, there is no basis for concluding that a mandatory capital sentencing scheme is unconstitutional. Because the Court's cases requiring individualized sentencing in the capital context are wrongly decided, they cannot serve as a valid foundation for the novel rule regarding mandatory life-without-parole sentences for juveniles that the Court announces today.

## B

In any event, this Court has already declined to extend its individualized-sentencing rule beyond the death penalty context. In *Harmelin*, the defendant was convicted of

possessing a large quantity of drugs. 501 U. S., at 961 (opinion of SCALIA, J.). In accordance with Michigan law, he was sentenced to a mandatory term of life in prison without the possibility of parole. *Ibid.* Citing the same line of death penalty precedents on which the Court relies today, the defendant argued that his sentence, due to its mandatory nature, violated the Cruel and Unusual Punishments Clause. *Id.,* at 994–995 (opinion of the Court).

The Court rejected that argument, explaining that "[t]here can be no serious contention . . . that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'" *Id.,* at 995. In so doing, the Court refused to analogize to its death penalty cases. The Court noted that those cases had "repeatedly suggested that there is no comparable [individualized-sentencing] requirement outside the capital context, because of the qualitative difference between death and all other penalties." *Ibid.* The Court observed that, "even where the difference" between a sentence of life without parole and other sentences of imprisonment "is the greatest," such a sentence "cannot be compared with death." *Id.*, at 996. Therefore, the Court concluded that the line of cases requiring individualized sentencing had been drawn at capital cases, and that there was "no basis for extending it further." *Ibid.*

*Harmelin*'s reasoning logically extends to these cases. Obviously, the younger the defendant, "the great[er]" the difference between a sentence of life without parole and other terms of imprisonment. *Ibid.* But under *Harmelin*'s rationale, the defendant's age is immaterial to the Eighth Amendment analysis. Thus, the result in today's cases should be the same as that in *Harmelin*. Petitioners, like the defendant in *Harmelin*, were not sentenced to death. Accordingly, this Court's cases "creating and clarifying the individualized capital sentencing doctrine" do not apply. *Id.,* at 995 (internal quotation marks omitted).

Nothing about our Constitution, or about the qualitative difference between any term of imprisonment and death, has changed since *Harmelin* was decided 21 years ago. What *has* changed (or, better yet, "evolved") is this Court's ever-expanding line of categorical proportionality cases. The Court now uses *Roper* and *Graham* to jettison *Harmelin*'s clear distinction between capital and noncapital cases and to apply the former to noncapital juvenile offenders.[4] The Court's decision to do so is even less supportable than the precedents used to reach it.

## III

As THE CHIEF JUSTICE notes, *ante,* at 8–9 (dissenting opinion), the Court lays the groundwork for future incursions on the States' authority to sentence criminals. In its categorical proportionality cases, the Court has considered " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Graham*, 560 U. S., at ___ (slip op., at 10) (quoting *Roper*, 543 U. S., at 563). In *Graham*, for example, the Court looked to "[a]ctual sentencing practices" to conclude that there was a national consensus against life-without-parole sentences for juvenile nonhomicide offenders. 560 U. S., at ___ (slip op., at 11–14); see also *Roper*, *supra*, at 564–565; *Atkins* v. *Virginia*, 536 U. S. 304, 316 (2002).

Today, the Court makes clear that, even though its

---

[4] In support of its decision not to apply *Harmelin* to juvenile offenders, the Court also observes that " '[o]ur history is replete with laws and judicial recognition that children cannot be viewed simply as miniature adults.' " *Ante*, at 19 (quoting *J. D. B.* v. *North Carolina*, 564 U. S. ___, ___ (2011) (slip op., at 10–11) (some internal quotation marks omitted)). That is no doubt true as a general matter, but it does not justify usurping authority that rightfully belongs to the people by imposing a constitutional rule where none exists.

decision leaves intact the discretionary imposition of life-without-parole sentences for juvenile homicide offenders, it "think[s] appropriate occasions for sentencing juveniles to [life without parole] will be uncommon." *Ante,* at 17. That statement may well cause trial judges to shy away from imposing life without parole sentences and embolden appellate judges to set them aside when they are imposed. And, when a future petitioner seeks a categorical ban on sentences of life without parole for juvenile homicide offenders, this Court will most assuredly look to the "actual sentencing practices" triggered by this case. The Court has, thus, gone from "merely" divining the societal consensus of today to shaping the societal consensus of tomorrow.

\*　　\*　　\*

Today's decision invalidates a constitutionally permissible sentencing system based on nothing more than the Court's belief that "its own sense of morality . . . pre-empts that of the people and their representatives." *Graham*, *supra*, at ___ (THOMAS, J., dissenting) (slip op., at 29). Because nothing in the Constitution grants the Court the authority it exercises today, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 10–9646 and 10–9647

_____

EVAN MILLER, PETITIONER
10–9646        *v.*
ALABAMA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF ALABAMA

KUNTRELL JACKSON, PETITIONER
10–9647        *v.*
RAY HOBBS, DIRECTOR, ARKANSAS
DEPARTMENT OF CORRECTION

ON WRIT OF CERTIORARI TO THE SUPREME COURT
OF ARKANSAS

[June 25, 2012]

JUSTICE ALITO, with whom JUSTICE SCALIA joins, dissenting.

The Court now holds that Congress and the legislatures of the 50 States are prohibited by the Constitution from identifying any category of murderers under the age of 18 who must be sentenced to life imprisonment without parole. Even a 17½-year-old who sets off a bomb in a crowded mall or guns down a dozen students and teachers is a "child" and must be given a chance to persuade a judge to permit his release into society. Nothing in the Constitution supports this arrogation of legislative authority.

The Court long ago abandoned the original meaning of the Eighth Amendment, holding instead that the prohibition of "cruel and unusual punishment" embodies the "evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958)

(plurality opinion); see also *Graham* v. *Florida*, 560 U. S. ___, ___ (2010) (slip op., at 7); *Kennedy* v. *Louisiana*, 554 U. S. 407, 419 (2008); *Roper* v. *Simmons*, 543 U. S. 551, 560–561 (2005); *Atkins* v. *Virginia*, 536 U. S. 304, 311–312 (2002); *Hudson* v. *McMillian*, 503 U. S. 1, 8 (1992); *Ford* v. *Wainwright*, 477 U. S. 399, 406 (1986); *Rhodes* v. *Chapman*, 452 U. S. 337, 346 (1981); *Estelle* v. *Gamble*, 429 U. S. 97, 102 (1976). Both the provenance and philosophical basis for this standard were problematic from the start. (Is it true that our society is inexorably evolving in the direction of greater and greater decency? Who says so, and how did this particular philosophy of history find its way into our fundamental law? And in any event, aren't elected representatives more likely than unaccountable judges to reflect changing societal standards?) But at least at the start, the Court insisted that these "evolving standards" represented something other than the personal views of five Justices. See *Rummel* v. *Estelle*, 445 U. S. 263, 275 (1980) (explaining that "the Court's Eighth Amendment judgments should neither be nor appear to be merely the subjective views of individual Justices"). Instead, the Court looked for objective indicia of our society's moral standards and the trajectory of our moral "evolution." See *id.,* at 274–275 (emphasizing that "'judgment should be informed by objective factors to the maximum possible extent'" (quoting *Coker* v. *Georgia*, 433 U. S. 584, 592 (1977) (plurality opinion))).

In this search for objective indicia, the Court toyed with the use of public opinion polls, see *Atkins*, *supra,* at 316, n. 21, and occasionally relied on foreign law, see *Roper* v. *Simmons*, *supra,* at 575; *Enmund* v. *Florida*, 458 U. S. 782, 796, n. 22 (1982); *Thompson* v. *Oklahoma*, 487 U. S. 815, 830–831 (1988); *Coker*, 433 U. S., at 596, n. 10 (plurality opinion).

In the main, however, the staple of this inquiry was the tallying of the positions taken by state legislatures. Thus,

in *Coker*, which held that the Eighth Amendment prohibits the imposition of the death penalty for the rape of an adult woman, the Court noted that only one State permitted that practice. *Id.*, at 595–596. In *Enmund*, where the Court held that the Eighth Amendment forbids capital punishment for ordinary felony murder, both federal law and the law of 28 of the 36 States that authorized the death penalty at the time rejected that punishment. 458 U. S., at 789.

While the tally in these early cases may be characterized as evidence of a national consensus, the evidence became weaker and weaker in later cases. In *Atkins*, which held that low-IQ defendants may not be sentenced to death, the Court found an anti–death-penalty consensus even though more than half of the States that allowed capital punishment permitted the practice. See 536 U. S., at 342 (SCALIA, J., dissenting) (observing that less than half of the 38 States that permit capital punishment have enacted legislation barring execution of the mentally retarded). The Court attempted to get around this problem by noting that there was a pronounced trend against this punishment. See *id.,* at 313–315 (listing 18 States that had amended their laws since 1986 to prohibit the execution of mentally retarded persons).

The importance of trend evidence, however, was not long lived. In *Roper*, which outlawed capital punishment for defendants between the ages of 16 and 18, the lineup of the States was the same as in *Atkins*, but the trend in favor of abolition—five States during the past 15 years— was less impressive. *Roper*, 543 U. S., at 564–565. Nevertheless, the Court held that the absence of a strong trend in support of abolition did not matter. See *id.,* at 566 ("Any difference between this case and *Atkins* with respect to the pace of abolition is thus counterbalanced by the consistent direction of the change").

In *Kennedy* v. *Louisiana*, the Court went further. Hold-

ing that the Eighth Amendment prohibits capital punishment for the brutal rape of a 12-year-old girl, the Court disregarded a nascent legislative trend *in favor of permitting capital punishment* for this narrowly defined and heinous crime. See 554 U. S., at 433 (explaining that, although "the total number of States to have made child rape a capital offense . . . is six," "[t]his is not an indication of a trend or change in direction comparable to the one supported by data in *Roper*"). The Court felt no need to see whether this trend developed further—perhaps because true moral evolution can lead in only one direction. And despite the argument that the rape of a young child may involve greater depravity than some murders, the Court proclaimed that homicide is categorically different from all (or maybe almost all) other offenses. See *id.,* at 438 (stating that nonhomicide crimes, including child rape, "may be devastating in their harm . . . but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared to murder in their severity and irrevocability" (internal quotation marks and citation omitted)). As the Court had previously put it, "death is different." *Ford*, *supra*, at 411 (plurality opinion).

Two years after *Kennedy*, in *Graham* v. *Florida*, any pretense of heeding a legislative consensus was discarded. In *Graham*, federal law and the law of 37 States and the District of Columbia permitted a minor to be sentenced to life imprisonment without parole for nonhomicide crimes, but despite this unmistakable evidence of a national consensus, the Court held that the practice violates the Eighth Amendment. See 560 U. S., at ___ (THOMAS, J., dissenting) (slip op., at 1–3). The Court, however, drew a distinction between minors who murder and minors who commit other heinous offenses, so at least in that sense the principle that death is different lived on.

Today, that principle is entirely put to rest, for here we

are concerned with the imposition of a term of imprisonment on offenders who kill. The two (carefully selected) cases before us concern very young defendants, and despite the brutality and evident depravity exhibited by at least one of the petitioners, it is hard not to feel sympathy for a 14-year-old sentenced to life without the possibility of release. But no one should be confused by the particulars of the two cases before us. The category of murderers that the Court delicately calls "children" (murderers under the age of 18) consists overwhelmingly of young men who are fast approaching the legal age of adulthood. Evan Miller and Kuntrell Jackson are anomalies; much more typical are murderers like Christopher Simmons, who committed a brutal thrill-killing just seven months shy of his 18th birthday. *Roper*, 543 U. S., at 556.

Seventeen-year-olds commit a significant number of murders every year,[1] and some of these crimes are incredibly brutal. Many of these murderers are at least as mature as the average 18-year-old. See *Thompson*, 487 U. S., at 854 (O'Connor, J., concurring in judgment) (noting that maturity may "vary widely among different individuals of the same age"). Congress and the legislatures of 43 States have concluded that at least some of these murderers should be sentenced to prison without parole, and 28 States and the Federal Government have decided that for some of these offenders life without parole should be mandatory. See *Ante*, at 20–21, and nn. 9–10. The majority of this Court now overrules these legislative judgments.[2]

————————

[1] Between 2002 and 2010, 17-year-olds committed an average combined total of 424 murders and nonnegligent homicides per year. See Dept. of Justice, Bureau of Justice Statistics, §4, Arrests, Age of persons arrested (Table 4.7).

[2] As the Court noted in *Mistretta* v. *United States*, 488 U. S. 361, 366 (1989), Congress passed the Sentencing Reform Act of 1984 to eliminate discretionary sentencing and parole because it concluded that these practices had led to gross abuses. The Senate Report for the 1984 bill

It is true that, at least for now, the Court apparently permits a trial judge to make an individualized decision that a particular minor convicted of murder should be sentenced to life without parole, but do not expect this possibility to last very long.  The majority goes out of its way to express the view that the imposition of a sentence of life without parole on a "child" (*i.e.,* a murderer under the age of 18) should be uncommon.  Having held in *Graham* that a trial judge with discretionary sentencing authority may not impose a sentence of life without parole on a minor who has committed a nonhomicide offense, the Justices in the majority may soon extend that holding to minors who commit murder.  We will see.

What today's decision shows is that our Eighth Amendment cases are no longer tied to any objective indicia of society's standards.  Our Eighth Amendment case law is now entirely inward looking.  After entirely disregarding objective indicia of our society's standards in *Graham*, the Court now extrapolates from *Graham*.  Future cases may extrapolate from today's holding, and this process may continue until the majority brings sentencing practices into line with whatever the majority views as truly evolved standards of decency.

The Eighth Amendment imposes certain limits on the

---

rejected what it called the "outmoded rehabilitation model" for federal criminal sentencing.  S. Rep. No. 98–225, p. 38 (1983).  According to the Report, "almost everyone involved in the criminal justice system now doubts that rehabilitation can be induced reliably in a prison setting, and it is now quite certain that no one can really detect whether or when a prisoner is rehabilitated." *Ibid.*  The Report also "observed that the indeterminate-sentencing system had two 'unjustifi[ed] and 'shameful' consequences.  The first was the great variation among sentences imposed by different judges upon similarly situated offenders.  The second was uncertainty as to the time the offender would spend in prison.  Each was a serious impediment to an evenhanded and effective operation of the criminal justice system." *Mistretta*, *supra*, at 366 (quoting S. Rep. No. 98–225, at 38, 65 (citation omitted)).

sentences that may be imposed in criminal cases, but for the most part it leaves questions of sentencing policy to be determined by Congress and the state legislatures—and with good reason. Determining the length of imprisonment that is appropriate for a particular offense and a particular offender inevitably involves a balancing of interests. If imprisonment does nothing else, it removes the criminal from the general population and prevents him from committing additional crimes in the outside world. When a legislature prescribes that a category of killers must be sentenced to life imprisonment, the legislature, which presumably reflects the views of the electorate, is taking the position that the risk that these offenders will kill again outweighs any countervailing consideration, including reduced culpability due to immaturity or the possibility of rehabilitation. When the majority of this Court countermands that democratic decision, what the majority is saying is that members of society must be exposed to the risk that these convicted murderers, if released from custody, will murder again.

Unless our cases change course, we will continue to march toward some vision of evolutionary culmination that the Court has not yet disclosed. The Constitution does not authorize us to take the country on this journey.